RAFAEL A. BUSCAGLIA, TESORERO DE PUERTO RICO, peticionario, *v.* TRIBUNAL DE CONTRIBUCIONES DE PUERTO RICO, demandado; SUCESORES DE ABARCA, INC., interventora.

Núm. 176.—*Sometido:* Enero 10, 1949. *Resuelto:* Abril 14, 1949.

*Hon. Procurador General Vicente Géigel Polanco (Luis Negrón Fernández, Ex Procurador General,* en el alegato) y *Carlos Santana Becerra, Procurador General Auxiliar,* abogados del peticionario; *D. Guerrero Noble,* abogado de la interventora.

El Juez Asociado Señor Marrero emitió la opinión del tribunal.

La interventora Sucesores de Abarca, Inc., y el peticionario Tesorero de Puerto Rico radicaron ante el Tribunal de Contribuciones una estipulación, cuyos párrafos esenciales son los siguientes:

"A—Que se elimine de la tasación de propiedad mueble para el año 1944-45 la suma de $11,412.85 que representa créditos en los bancos, quedando como tributable la suma de $1,027.15.

"B—Que existiendo duplicación en la tasación del solar de 450 m/c con casa y garaje en la calle Palma, de Miramar, año 1944-45, se mantenga la tasación a nombre de la querellante en el valor de $5,400, y se le acredite el montante pagado por el recibo número 20, año 1944-45, expedido a nombre de Sucesores de Abarca, S. en C. sobre la misma propiedad valorada en la suma de $5,000.

"C—Que en la partida de $27,910 titulada 'Mejoras al Terreno' existe un error, debiendo quedar la misma reducida a la suma de $5,317.46. Se aclara que la querellante sostiene que no viene obligada a pagar contribución sobre dichos $5,317.46 porque representa mejoras al terreno arrendado a la Sucesión Abarca donde opera su negocio.

"D—Que en cuanto a la partida 'Edificios y Maquinaria' montante a $297,370 (Ex. A. Querellante) la controversia se limitó a

determinar la razonabilidad de la depreciación sufrida por la maquinaria sobre la cual se fijó una valoración de $166,481. Se acepta la tasación de $52,844 fijada a los edificios incluídos en la partida de $297,370.

"E—Que la valoración total incluye la partida de $56,112 denominada 'Livening (sic) Factor' por el tasador Sr. Eduardo E. Saldaña. Se aclara que la querellante sostiene que dicha partida no debe sumarse a la tasación de la propiedad por considerarse la misma arbitraria, caprichosa, irrazonable e impropia.

"F—Que el caso P–369 T. C. Año 1945–46 entre las mismas partes con, excepción de las letras A y B de esta estipulación, es idéntico al año 1944–45, por lo que las partes convienen en someterlo a este Hon. Tribunal por la prueba presentada en el caso P–259 T. C. aclarando que en el caso P–369 T. C. la querellante estuvo conforme y pagó contribución sobre la suma de $159,220."

Vistos los casos conjuntamente y luego de considerar la prueba aducida tanto por la querellante como por el querellado, el tribunal recurrido dictó sendas resoluciones sosteniendo como correcta y válida la valuación de $2,250 para el solar de 450 metros cuadrados, la de $3,150 para los edificios que radican en el mismo y la de $5,317.46 para las mejoras al terreno, pero haciendo constar que éstas deben valorarse juntamente con el terreno y con cargo al que aparezca ser dueño del mismo; declarando con lugar las querellas en lo pertinente a la partida de $56,112 que fuera agregada por el Tesorero en concepto del llamado *enlivening factor* (factor de vida) y ordenando a éste que se abstenga de agregar en su determinación del valor de los inmuebles de la corporación querellante cantidad alguna en tal concepto; y declarándolas sin lugar en todos sus demás extremos. Para revisar las resoluciones así dictadas expedimos el auto de *certiorari* autorizado por la Ley núm. 169 de 15 de mayo de 1943 (págs. 601, 611), pero únicamente en cuanto a lo decidido por dicho Tribunal en relación con los párrafos C y E de la ameritada estipulación, es decir, respecto a los $5,317.46 de las mejoras al terreno y a los $56,112 del llamado factor de vida.

 El peticionario sólo ha elevado parte de la prueba que desfiló ante el Tribunal de Contribuciones. Esto se ha debido, según alega, al hecho de que uno de los taquígrafos que intervinieron en el caso renunció su cargo en el Gobierno y de que a pesar de las gestiones hechas por el peticionario para que ese taquígrafo transcriba las notas de las vistas que tomó, previo pago de su labor, no se ha logrado que así lo haga. Al peticionario, sin embargo, incumbe colocar a este Tribunal en condiciones de resolver el recurso. Al elevar solamente parte de la transcripción de evidencia corre el riesgo de que no podamos decidir debidamente algunas de las cuestiones por él planteadas. *Buscaglia* v. *Tribunal de Contribuciones; Llamas Muñiz, Interventor*, 67 D.P.R. 32, 34. Eso precisamente ocurre en este caso, ya que la prueba que tenemos ante nuestra consideración consiste tan sólo del testimonio de testigos de la aquí interventora. No sabemos cuál fué la prueba del Tesorero. La que tenemos a la vista revela que la partida de $5,317.46 corresponde a mejoras hechas a los terrenos en que están enclavados los edificios ocupados por la interventora, así como que ésta no es propietaria ni de los edificios ni de los terrenos que ocupa, siendo por el contrario arrendataria de los mismos y pagando a los arrendadores un canon por su uso. Bajo estas circunstancias, es natural que dichas mejoras sean tasadas a nombre del dueño de los mismos y no a nombre de la arrendataria. Artículo 298 del Código Político. No erró el Tribunal de Contribuciones al así resolverlo.

 La partida de $56,112 a que se hace referencia bajo el párrafo E de la estipulación corresponde a lo que el testigo Eduardo E. Saldaña calificó de *enlivening factor*. Este testigo fué llamado por la interventora. Su testimonio, unido a la otra prueba elevada, demuestra fuera de toda duda que el procedimiento seguido para la fijación de este llamado *enlivening factor*, o factor de vida, fué completamente arbitrario, caprichoso e irrazonable. Veamos:

Sucesores de Abarca, Inc., tiene establecida una fundición en el barrio de Miramar, de Santurce. En adición a ello se dedica a la compraventa de mercancías; a negocios de representaciones y comisiones, especialmente de maquinaria; a realizar trabajos de emergencia en buques de vapor; a trabajos de peritaje y consultas y a contratar con centrales azucareras sobre la montura y demolición de éstas.

Al tasar el valor de los inmuebles de la interventora, el Tesorero agregó al valor físico de éstos lo que calificó de factor de vida y al computar éste tomó en consideración (1) los beneficios netos derivados por la empresa durante los últimos dos años, según las planillas rendidas por ésta; (2) las anualidades para las reservas requeridas para reemplazar las distintas propiedades de la empresa, a saber: las reservas para talleres, para mobiliario y para automóviles, camiones y laboratorio; (3) el beneficio neto que razonablemente debe de producir el valor absoluto de los bienes y (4) el capital industrial razonable de la empresa. Como sólo hacía dos años que la interventora se había constituído en corporación, sumó los ingresos informados por ésta para cada año, o sea: $230,847.94 para el 1942 y $207,417.73 para 1943, dándole esas dos partidas un ingreso neto promedio de $219,132.84 para cada año. Supuso que los gastos informados por la interventora incluían todas las contribuciones por ésta pagadas y fijó (no se desprende de donde tomó estas cantidades) las siguientes partidas para reservas: $13,219 para talleres; $864 para reemplazo de mobiliario y $1,155 para reemplazo de autos, camiones y laboratorio. El testigo Saldaña, que fué la persona que como funcionario del Departamento de Hacienda tasó las propiedades de la interventora y que, como ya hemos dicho, testificó llamado por la interventora, no declaró, sin embargo, tener conocimiento de los distintos negocios o actividades a que se dedica la querellante dentro y fuera de los edificios que se tasaban; ni si tales edificios se habían construído expresamente para la in-

dustria y negocios a que la interventora se dedicaba; ni si los edificios podían utilizarse satisfactoriamente en cualquier otra industria o negocio; ni sobre los fundamentos que tuvo el Tesorero para el cálculo total que hizo de $15,238 para las reservas ya mencionadas. En cuanto a los beneficios, este testigo determinó que el valor absoluto de los bienes de la interventora era $610,185, mas no dijo cómo había llegado a esa determinación. Creyó que el 15 por ciento era un tipo de interés razonable y, multiplicando los citados $610,185 por ese 15 por ciento, concluyó que $91,527.75 era el beneficio neto razonable. Manifestó también que la suma de $100,000 representaba un capital industrial adecuado para la corporación y a él agregó los $15,238 para reservas y los $91,527.75 que había determinado como beneficios, dándole esto un total de $206,765.75. De los $219,132.84 determinados como ingreso promedio para cada año, dedujo esa última cantidad, obteniendo entonces una diferencia de $12,367.09, equivalente a lo que el testigo calificó de remanente. Capitalizó esa suma al 16 por ciento y obtuvo un "factor de vida" de $77,295. Sin embargo, no fué ésa la cantidad que como *enlivening factor* o factor de vida utilizó el Tesorero en su tasación. En su lugar, fijó tal factor en $56,112. Ello se debió a que el Tesorero utilizó la cantidad de $632,775 como valor absoluto de las propiedades y no los $610,185 utilizados por el testigo Saldaña. La diferencia entre el valor absoluto de las propiedades mencionado por el tasador del Tesorero y la utilizada por éste se debe a que el Tesorero aceptó haber cometido un error al tasar las mejoras del terreno. (Véase el apartado C de la estipulación, según el cual el Tesorero admite haberse equivocado al tasar las mejoras en $27,910 en vez de $5,317.46.)

Como se ha visto, las sumas tomadas para reservas fueron fijadas caprichosamente. Igual sucedió con el 15 por ciento fijado como tipo de interés razonable. Lo mismo ocu-

rrió con los $100,000 fijados como capital en circulación([1])
y con el tipo de interés de 16 por ciento que tomó para capi-
talizar lo que calificó de remanente. Habiendo tomado esas
cantidades y esos tipos de intereses caprichosamente o al
azar, la lógica indica que el resultado obtenido tiene igual-
mente que ser caprichoso y arbitrario.

Es presunción harto conocida en derecho que en materia
de contribuciones toda determinación contributiva hecha por
el Tesorero de Puerto Rico se presume correcta. *Mayagüez
Sugar Co.* v. *Sancho, Tes.,* 64 D.P.R. 734; *Sunday Lake Iron
Co.* v. *Wakefield,* 247 U. S. 350; *Alfred J. Sweet, Inc.* v.
*City of Auburn,* 180 Atl. 803, 104 A.L.R. 784; Cooley, *Taxa-
tion,* vol. 3, cuarta edición, sección 1011, pág. 2041; Id., sec-
ción 1073, pág. 2182. Para que la tasación sea invalidada no
basta la comisión de un mero error por el Tesorero o que
la corte tenga un criterio distinto respecto al valor de las
propiedades. *Chicago G. W. Ry.* v. *Kendall,* 266 U. S. 94.
La determinación del Tesorero sólo será anulada cuando se
demuestra que la misma es irrazonable, arbitraria, injusta o
caprichosa, resultando por ende en un atropello para el con-
tribuyente. *Great Northern Ry.* v. *Weeks,* 297 U. S. 135;
*S. S. Kresge Co.* v. *City of Detroit,* 276 Mich. 565, 268 N. W.
740, 107 A.L.R. 1258; *Alfred J. Sweet, Inc.* v. *City of Auburn,*
supra. En el presente caso la prueba que a grandes rasgos
hemos reseñado demuestra de manera palmaria cuán irrazo-
nable, arbitrario, caprichoso e injusto fué el procedimiento
utilizado por el Tesorero. Por ese solo motivo la adición del
llamado *enlivening factor* no puede ser sostenida.

█ Pero hay algo más. El llamado *enlivening factor* no
es de aplicación cuando se tasan inmuebles como los de la
interventora. Ese factor de vida se utiliza más bien al eva-
luar bienes tangibles e intangibles de empresas de servicio
público, especialmente para fines de fijación de tarifas o para

---

([1])La interventora adujo prueba, que no aparece controvertida, al efecto
de que su capital en circulación en 30 de junio de 1943 ascendió a $569,201.93
y en 30 de junio de 1944 a $724,408.83.

imponer a éstas una contribución sobre su franquicia. Los casos citados por el peticionario así lo demuestran.([2]) Igualmente así lo revela el tratadista Bonbright en el volumen I, págs. 511, 595 y siguientes de su obra *Valuation of Property*. Véase también 41 Yale L. J. 487.

■ Dispone nuestro Código Político en su artículo 295 " . . . Que tan pronto como fuere posible, después del 15 de enero de cada año, será deber del tasador de cada distrito de tasación, llenar una planilla que manifieste detalladamente, y por separado, *cada propiedad inmueble* y las mejoras hechas en la misma . . . El tasador, sin embargo, no habrá de atenerse en modo alguno a la relación de bienes ni al valor que tuvieren fijado en la declaración del contribuyente, sino que procederá, en vista de los informes así adquiridos, o de los demás datos que pudiere obtener, a *tasar la propiedad en su valor real y efectivo, sin tener en cuenta una venta forzada, según su leal saber y entender.''* (Bastardillas nuestras.) El valor real y efectivo de los inmuebles no puede en manera alguna ser el costo de reproducción de los mismos menos su depreciación y obsolescencia, más el promedio por cierto número de años de los beneficios obtenidos por el negocio o industria que se explota en tales inmuebles. El valor real y efectivo de inmuebles, sin tener en cuenta una venta forzada, ha de ser sin duda el valor en el mercado de los mismos. *Mayagüez Sugar Co.* v. *Sancho, Tes.,* supra; *Thaw* v. *Fairfield,* 160 A.L.R. 679, 43 A.2d 65; *Phillips Petroleum Co.* v. *Townsend,* 63 F.2d 293.

El Tesorero, a nuestro juicio, ha querido aplicar en el presente caso bajo el nombre de *enlivening factor* lo que se conoce generalmente en derecho americano como *earning capacity.* Esta capacidad productiva se utiliza de ordinario al fijar el valor de tasación de aquellas propiedades que de

---

([2])*Susquehanna Co.* v. *Tax Comm.,* 283 U. S. 291; *Southern Ry. Co.* v. *Kentucky,* 274 U. S. 76; *Omaha* v. *Omaha Water Co.,* 218 U. S. 180; *Smyth* v. *Ames,* 169 U. S. 466; *Monongahela Navigat'n Co.* v. *United States,* 148 U. S. 312; *Texas-Empire Pipe Line Co.* v. *Commissioner of Internal Revenue,* 127 F.2d 220.

por sí producen beneficios. Por ejemplo, al fijar la tasación de un edificio de apartamientos se toma en consideración entre otras cosas su productividad, o sea, el monto de las rentas producidas por el edificio. Esto es natural y lógico que así sea, pues un edificio de apartamientos que por sus condiciones generales, vecindario, etc. produce pocos ingresos al arrendador no debe jamás tasarse por la misma suma que un edificio de apartamientos situado en la mejor urbanización, mantenido en las mejores condiciones y arrendado a inquilinos que pagan altas rentas. Podrá haber similitud entre un edificio de apartamientos construído en vecindario pobre y otro enclavado en vecindario de familias pudientes, pero la lógica indica que la tasación de ambos ha de ser distinta. Por regla general, la capacidad productiva de un inmueble, a distinción de los beneficios reales del negocio o industria explotados dentro de éste, será el factor a considerarse al valorar propiedad real para fines contributivos. *Somers* v. *Meriden*, 95 A.L.R. 434; 51 Am. Jur. sección 698, pág. 650; L.R.A. 1916 C 529.

Antes de finalizar esta opinión debemos hacer constar que además de citar y comentar ampliamente los casos que figuran en la nota 2, el Tesorero de Puerto Rico al discutir en su alegato sobre el llamado *enlivening factor* pone gran énfasis en lo dicho por nosotros en el caso de *Mayagüez Sugar Co.* v. *Sancho, Tes.*, supra. Empero, no tiene ese caso el alcance que le da dicho funcionario. En él resolvimos en síntesis que toda determinación contributiva hecha por el Tesorero se presume correcta, que tal determinación será sostenida a no ser que el contribuyente que la impugna demuestre con evidencia persuasiva que la tasación es tan excesiva que resulta injusta y confiscatoria y pruebe a la corte cuál es el valor razonable de la propiedad en el mercado y que la Mayagüez Sugar Co. no había destruído tal presunción al limitarse a probar el costo original depreciado de la propiedad. Es cierto, no obstante, que en esa opinión usamos el término

factor de vida. Lo hicimos, sin embargo, de paso al mencionar el sistema utilizado por el ingeniero tasador de centrales del Departamento de Hacienda al evaluar la propiedad en él envuelta. Pero en manera alguna resolvimos allí que al tasar inmuebles de empresas industriales corrientes a los fines de fijar su valor real y efectivo, tal cual provee el artículo 295 del Código Político, pudiera utilizarse el llamado *enlivening factor*. También es cierto que al final de dicha opinión dijimos que "Toda vez que la demandante no presentó a la corte inferior una computación que reflejase razonablemente el valor en el mercado de esa propiedad, es decir, lo que hubiera estado dispuesto a pagar por ella una persona que hubiese querido comprarla, considerando su situación, su condición y *los beneficios que podía obtener de dicha fábrica,* debemos concluir que la corte inferior no erró al desestimar la demanda." (Bastardillas nuestras.) Sin embargo, al hablar de los beneficios que podían obtenerse de dicha fábrica nuestro propósito no fué otro que referirnos a los beneficios que los bienes a ser tasados producían de por sí, mas nunca a los beneficios producidos por la industria misma. De ahí que citáramos las monografías que aparecen en L.R.A. 1916 C, pág. 529 y en 95 A.L.R. 442, que, como ya hemos indicado al citarlas de nuevo en esta opinión, se refieren a *earning capacity* y no al *enlivening factor*.

Deben confirmarse las resoluciones que han sido objeto del presente recurso.

El Juez Asociado Sr. Negrón Fernández no intervino.