RAMÓN R. WOLFF ABOY, demandante y apelante *v.* JOSÉ HERNÁNDEZ USERA, ET AL., demandados y apelados.

Número 10904.

*Sometido:* 2 de abril de 1954. *Resuelto:* 2 de junio de 1954.

*J. J. Ortiz Alibrán, Félix Ochoteco, Jr.* y *Gerardo Ortiz del Rivero,* abogados del apelante; *Córdova & González,* abogados de los apelados Noble, Hernández Usera, Vázquez de Hernández y Hernández Vázquez; *Santiago Polanco Abreu,* abogado de los apelados Vidal Aboy.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del tribunal.

El demandante en este litigio ha apelado de una sentencia dictada por la Sala de San Juan del Tribunal Superior, que declaró sin lugar una demanda en que se solicita que se declare nulo, por ser espurio y no auténtico, un documento de fecha 1 de septiembre de 1928, que fué protocolizado como el testamento ológrafo de doña Encarnación Aboy Vda. de Cintrón, según resolución de fecha 26 de agosto de 1949. En la opinión emitida se dice, en parte, lo siguiente:

"Doña Encarnación Aboy Vda. de Cintrón falleció el 16 de agosto de 1949, siendo viuda de don Luis Manuel Cintrón, y sin haber dejado ascendientes o descendientes.

"Con fecha 26 de agosto de 1949, a petición de don José Hernández Usera, y luego de cumplirse los trámites correspondientes, se dictó por este tribunal resolución ordenando la protocolización del testamento ológrafo de doña Encarnación. En dicho documento, que tiene fecha de primero de septiembre de 1928, se hace un legado de $250,000 a Gloria María Hernández, hija de

los esposos José Hernández Usera y María Vázquez, sobrina ésta de doña Encarnación, tres legados de $10,000 cada uno a don Ramón Aboy y doña Angela Aboy, hermanos de doña Encarnación, y a don José Hernández Usera, y cinco legados, de dos mil dólares cada uno, a los hijos de doña Rosa Aboy, difunta hermana de doña Encarnación. El resto del caudal corresponde, según el documento, a doña María Vázquez de Hernández. Se designan albaceas a don José Hernández Usera y a don Arturo Noble. El documento dispone que cualquier legatario que ataque judicial o extrajudicialmente el testamento perderá su legado. Exhibit 1 del demandante.

"El 9 de febrero de 1950 Ramón Wolff, uno de los sobrinos favorecidos con un legado de dos mil dólares en el documento protocolizado como el testamento ológrafo de doña Encarnación, radicó la demanda en el caso de autos, contra los albaceas y legatarios designados en dicho documento, impugnando el documento protocolizado a base de que no fué escrito por doña Encarnación. Como segunda causa de acción, el demandante impugnó ciertos traspasos de bienes inmuebles de doña Encarnación hechos por don José Hernández Usera, como apoderado de ésta, a José Luis Hernández, hijo de don José, y por José Luis Hernández a doña María Vázquez de Hernández Usera. Como tercera causa de acción, el demandante alegó que don José Hernández Usera viene administrando los bienes de doña Encarnación desde el año 1917, y que nunca rindió cuentas a ésta ni a sus herederos. Solicita el demandante se declare nulo el testamento protocolizado, y en vigor un testamento abierto otorgado por doña Encarnación el 5 de junio de 1911 en virtud del cual, y por haber fallecido los herederos instituídos en el mismo, resultarían herederos de doña Encarnación su hermano, don Ramón, y los descendientes de sus difuntas hermanas Angela y Rosa. Solicita, además, el demandante se consideren inexistentes los traspasos impugnados en la segunda causa de acción, y se ordene al demandado José Hernández Usera rinda cuentas de su administración de los bienes de doña Encarnación desde el año 1917.

"Los demandados José Hernández Usera, María Vázquez de Hernández, José Luis Hernández, Gloria María Hernández Vázquez y Arturo Noble contestaron la demanda alegando que el testamento protocolizado fué todo escrito, fechado y firmado por doña Encarnación. En cuanto a la segunda y la tercera causa de acción, dichos demandados alegaron que, siendo válido el tes-

tamento protocolizado, el demandante carece de interés o derecho para impugnar los traspasos o exigir la rendición de cuentas a que se refieren dichas causas de acción. Los otros demandados todos fueron emplazados, y oportunamente se anotó su rebeldía. Luego se dejó sin efecto la anotación de rebeldía en cuanto a los demandados Enrique, Angelita y Margarita Vidal Aboy, quienes radicaron una contestación en la cual ni admiten ni niegan las alegaciones de la demanda.

"Como se puede ver de la exposición que antecede, la cuestión en controversia, a base de las alegaciones, es si el documento protocolizado como el testamento ológrafo de doña Encarnación fué o no escrito de su puño y letra.

"Fué el caso a juicio y las partes presentaron evidencia documental y testifical en torno a la legitimidad del documento impugnado.

"En apoyo de su teoría de que el documento es falso, ofreció el demandante el testimonio de dos peritos, Herman V. Bennett y Rafael Fernández Ruenes, y la declaración de don Ramón Aboy Benítez, así como diez ejemplares de la letra de doña Encarnación, consistentes en cinco cartas escritas por ésta, dos fechadas en el año 1928, una en el 1938 y dos en el 1939, y fotografías de cinco firmas de doña Encarnación en documentos públicos, cuatro de ellas hechas antes de enviudar doña Encarnación (en los años 1901, 1905, 1906 y 1911) y la quinta en el año 1940.

"Los demandados presentaron y el tribunal admitió en evidencia un gran número de cartas, postales y otros documentos identificados como escritos por doña Encarnación y fotografías de 29 firmas de doña Encarnación en escrituras públicas, firmas éstas que datan desde el año 1922 al 1931, ambos inclusive. Además, los demandados ofrecieron la declaración del perito Albert D. Osborn, y de varios testigos más.

"Por el resultado de toda la prueba practicada, el Tribunal llega a la siguiente

"Conclusión de Derecho

"1. Después de examinar y de comparar su letra y sus firmas con la letra y las firmas auténticas de doña Encarnación, nuestra conclusión es que el documento impugnado fué escrito todo y firmado de mano propia por doña Encarnación Aboy viuda de Cintrón.

"Llegamos a esta conclusión a base de nuestra propia observación, y a la luz de toda la evidencia presentada, incluyendo las opiniones y conclusiones de los peritos.

"Pasaremos a exponer brevemente los principales fundamentos de nuestra conclusión.

"Consideremos en primer lugar la teoría y la prueba del demandante, pero antes de ello conviene exponer que la prueba de ambas partes demuestra que existen dos ejemplares del testamento impugnado, escritos por la misma persona, y sustancialmente idénticos, aunque con ciertas variaciones, principalmente ortográficas. Cada ejemplar está escrito en cuatro páginas de papel rayado con cinco firmas, una al margen de cada página y otra al pie de la última página. La prueba de los demandados es al efecto de que uno de los ejemplares, el que se protocolizó, (Exh. 1 del demandante) fué entregado por doña Encarnación a don José Hernández Usera, en septiembre de 1928, en un sobre marcado (con la misma letra del testamento):

"Testamento Ológrafo de Mrs. Encarnación Aboy Vda.
de Cintrón

San Juan, Puerto Rico

1 de septiembre de 1928'

"El otro ejemplar, (Exh. 2 del demandante) nos dice la prueba de los demandados que fué conservado por doña Encarnación hasta poco antes de su muerte, cuando fué entregado por ella a doña María Vázquez de Hernández, en un sobre marcado (con la misma letra del testamento):

'Copia

Testamento Ológrafo de Mrs. Encarnación Aboy Vda.
de Cintrón

San Juan, Puerto Rico

1 de Setiembre 1928'

"En la demanda (Párrafo XIII) dice el demandante que llegó a la conclusión de que el testamento protocolizado era espurio al cotejar una fotografía del documento protocolizado, con una copia fotostática que don José Hernández Usera hizo aparecer era copia del documento protocolizado, y darse cuenta de que no coincidían. Es decir, la existencia de dos ejemplares, y el hecho de que el demandante recibiera (del abogado de Hernández Usera) una copia fotostática del ejemplar que no fué protocolizado cuando había pedido que se le enviara copia fotostática del testamento, es lo que llevó al demandante a concluir que ambos ejemplares eran espurios. Los peritos del demandante también hacen especulaciones, a base de la existencia de dos ejemplares, tendentes a establecer la falsedad de ambos.

"La prueba demuestra que el envío de la copia fotostática del ejemplar no protocolizado al demandante obedeció a una equivocación del abogado de Hernández Usera, provocada por la similaridad entre los dos ejemplares. En cuanto a la existencia de dos ejemplares, hecho que, unido a la equivocación en el envío de la copia al demandante convenció a éste, según asegura en la demanda, de que el testamento era espurio, la prueba ofrece una explicación perfectamente consistente con la legitimidad del testamento. Entre otros elementos de prueba sobre este extremo, quizás el más elocuente es una carta escrita por doña Encarnación a Hernández Usera en enero 1, 1929, de cuya autenticidad no tenemos base alguna para dudar, que demuestra que para esa fecha ya ella había otorgado un testamento ológrafo, del cual conservaba un ejemplar y Hernández Usera otro.

"Don Ramón Aboy, testigo del demandante, declaró que al ver la copia fotostática del testamento que le mostró Hernández Usera, le pareció que las letras estaban hechas como un sello de goma, y además le extrañó el hecho de que doña Encarnación hubiera testado. No podemos convenir con este testigo respecto de las letras en el testamento. Lejos de asemejarse a sellos de goma, las letras del testamento se distinguen por las variaciones que demuestran. De la totalidad de la declaración del señor Aboy se desprende que estaba tan ignorante de varios testamentos abiertos otorgados por doña Encarnación, como del testamento ológrafo cuya existencia manifestó extrañarle.

"Aparte de la declaración de don Ramón Aboy, y de la circunstancia del envío al demandante de una copia fotostática del ejemplar del testamento que no fué el ejemplar protocolizado, la única prueba de falsedad del testamento que presentó el demandante fué la prueba pericial.

"Los peritos del demandante fundaron su conclusión de que el testamento es espurio, en el examen que hicieron de ambos ejemplares del testamento, y sus sobres, y la comparación de la letra y firmas de esos documentos con los diez ejemplares indubitados de firmas y escritos de doña Encarnación que ya hemos relacionado.

"El demandante tuvo acceso, desde varios meses antes de celebrarse el juicio, a gran parte de los numerosos ejemplares de la escritura y las firmas de doña Encarnación que luego presentaron en evidencia los demandados. Los abogados del demandante solicitaron, en moción radicada en febrero 27 de 1950, se les mostrara copia de todos los documentos utilizados por el

perito de los demandados para compararlos con los documentos impugnados. La prueba demuestra que se les mostraron dichos documentos, que los fotografiaron y que remitieron las fotografías a los peritos del demandante. Estos declaran que no hicieron un estudio de dichos documentos, ni le dieron importancia, por su procedencia, que para ellos era sospechosa.

"Sin embargo, entre dichos documentos había escritos indubitables de doña Encarnación, tales como firmas ante notarios públicos, solicitud de pasaporte y otros.

"Llama poderosamente la atención la actitud de los peritos del demandante al abstenerse de investigar los documentos que los propios abogados del demandante insistieron en examinar y fotografiar.

". . . . . . . .

". . . . . . . .

"A la luz de las observaciones del autor Osborn, que aparte de la autoridad que el prestigio de su autor les imprime, tan atinadas y razonables nos parecen, no encontramos justificación para la negativa de los peritos del demandante a estudiar los muchos patrones indubitados que produjeron los demandados, muchos de los cuales estuvieron al alcance del demandante y sus peritos meses antes del juicio, y el resto desde antes de comenzar el juicio (que duró dos semanas), al ser identificados por los demandados en la conferencia preliminar al juicio.

"Los diez patrones que utilizaron los peritos del demandante no son a nuestro juicio, los patrones adecuados, ni en cantidad ni en calidad, que recomienda el autor Osborn. Los patrones de los demandados, que los peritos del demandante declinaron examinar, incluyen muchos ejemplares de indiscutible autenticidad y que son precisamente, los patrones adecuados que recomienda el autor Osborn, es decir, patrones numerosos, contemporáneos con la fecha del documento impugnado, que incluyen fechas desde algunos años antes hasta algunos años después de dicha fecha, y que contienen decenas de firmas formales de doña Encarnación. Es de notarse, por ejemplo, que entre los diez patrones del demandante no se encuentra uno solo que contenga la firma completa, con su rúbrica, que sabemos por la prueba utilizaba doña Encarnación para la fecha del testamento impugnado, y años antes y después de esa fecha, es decir, 'Encarnación Aboy Vda. de Cintrón'. Los patrones de los demandados contienen más de treinta de estas firmas típicas, e indubitadas.

"La pobre calidad, e insuficiente cantidad, de los patrones utilizados por los peritos del demandante, los llevó a conclusiones cuya equivocación resulta patente en los casos en que pretendieron puntualizar diferencias entre las firmas y escritos de doña Encarnación, y las firmas y escritos de los documentos impugnados. Por ejemplo: sostuvieron los peritos del demandante, a base de las pocas firmas de doña Encarnación que utilizaron ellos como patrones, que ella consistentemente rompía la primera 'n' del nombre Encarnación, al firmar y señalaron que en la mayor parte de las firmas en los documentos impugnados dicha 'n' estaba escrita en un solo rasgo, sin romper. Concluyen que esta divergencia en la forma característica de ella escribir dicha letra es un indicio de falsedad. Sin embargo, examinando 29 firmas de doña Encarnación ante notarios públicos, fechadas desde el 1922 hasta el 1931, ofrecidas en evidencia por los demandados, y no consideradas por los peritos del demandante, encontramos que en sólo dos de dichas firmas aparece la primera 'n' rota. Es obvio que la equivocación sufrida por los peritos del demandante obedece a su disposición de llegar a conclusiones a base de patrones inadecuados, y a su negativa de considerar patrones adecuados.

"Por no hacer demasiado extensa esta opinión, nos abstenemos de detallar un número de errores adicionales cometidos por los peritos del demandante al puntualizar supuestas diferencias entre la escritura de doña Encarnación y la escritura de los documentos impugnados, diferencias que se basan en la insuficiencia de los patrones que utilizaron, y que se desvanecen cuando se examinan todos los patrones disponibles.

"Por lo demás, las declaraciones de los peritos del demandante, particularmente la de Fernández Ruenes, consiste de generalidades que no arrojaron luz sobre la controversia, y especulaciones más o menos ingeniosas, pero sin fundamentos de hecho que les brinden valor alguno.

"Aparte de la debilidad del caso del demandante, a quien correspondía el peso de probar la alegada falsedad del documento protocolizado, la prueba de los demandados ha contribuído notablemente a la conclusión a que hemos llegado. Demuestra que doña Encarnación tenía a Gloria María Hernández Vázquez y a María Vázquez de Hernández como hijas suyas, y que éstas, las dos personas más beneficiadas por el testamento impugnado, eran precisamente las personas que era de esperarse doña Encarnación favoreciera en cualquier testamento que pudiera

otorgar. Demuestra la confianza que depositaba doña Encarnación en don José Hernández Usera, padre de Gloria y esposo de María Vázquez. Sobre todo, los patrones presentados en evidencia por los demandados, y la declaración del perito Osborn comparando dichos patrones con los documentos impugnados, arrojan una luz clara sobre el problema planteado en este litigio. Como enfatizó el perito Osborn, y como indica su padre en la obra citada 'Questioned Documents', (aquí traducimos de la pág. 367 de dicha obra) : 'Es razonable esperar que una imitación se asemejará en ciertas cosas a la escritura imitada, y la evidencia concluyente de genuinidad debe ser algo más que esta apariencia general. Sin embargo, cuando la apariencia general es correcta, y, según se ha indicado, hay incorporadas varias cualidades delicadas de carácter individual en una firma escrita libremente, y especialmente cualidades delicadas ocasionales o raras, entonces tiene que llegarse a la conclusión de que la escritura es genuina.'

"La declaración del perito Osborn puntualiza las cualidades delicadas, y a veces raras y ocasionales, de la letra de doña Encarnación, que surgen a veces en la letra de los testamentos. Las declaraciones de los peritos del demandante puntualizan lo mismo, al señalar ellos rasgos y características de la letra impugnada que ellos no pudieron encontrar en sus limitados patrones, y por lo tanto consideraron ajenos a la testadora, pero que al estudiarse todos los patrones resultan o típicos de ella o rasgos y características ocasionales suyos.

"También se encuentran en los documentos impugnados las faltas de ortografía y los errores al acentuar que son típicos de los escritos de doña Encarnación.

"En resumen, la prueba en su totalidad milita poderosamente a favor de la legitimidad del testamento. Esa prueba del demandante no ha podido convecernos de lo contrario y de ahí que hayamos llegado a la conclusión de hecho que expusimos al principio."

El demandante ha apelado ante nos de la sentencia dictada por el Tribunal de San Juan y ha señalado varios errores. Impugna esencialmente la apreciación que de la prueba y el testimonio pericial hizo el tribunal a quo, y sostiene que la prueba demostró que el documento en controversia no fué firmado ni escrito por doña Encarnación Aboy

viuda de Cintrón. Hemos examinado detenidamente la totalidad de la prueba presentada y llegamos a la conclusión de que el testamento en cuestión fué escrito y firmado, de su puño y letra, por la señora Aboy, viuda de Cintrón y que, por lo tanto, es legítimo y genuino, no incurriendo en error alguno el tribunal a quo, y debiendo confirmarse la sentencia apelada.

. La apreciación de la prueba se basa en dos elementos primordiales de juicio, los documentos escritos y firmados indubitadamente por doña Encarnación, presentados como patrones o base de comparación con el documento impugnado, y el testimonio de los peritos de ambas partes. Es conveniente el delinear una norma general en cuanto a los límites de nuestra facultad de revisión con respecto a esos dos factores probatorios. La regla 52 de Enjuiciamiento Civil dispone que las conclusiones de hecho *basadas en testimonio oral* no se dejarán sin efecto a menos que sean claramente erróneas, debiendo tomarse en cuenta la oportunidad de la corte sentenciadora para juzgar de la credibilidad de los testigos. Es evidente que las conclusiones basadas exclusivamente en prueba documental, enviada en su forma original a este Tribunal, no cae dentro de la esfera de aplicabilidad de la Regla 52. Especialmente en un caso como el de autos, en que la resolución del litigio depende en gran parte en la escritura o carácter de letra (*handwriting*) contenida en varios documentos que están ante este Tribunal, no estamos obligados por la determinación del tribunal de primera instancia, y podemos hacer un examen original de los documentos y formular una decisión independiente en cuanto a las cuestiones de hecho envueltas, ya que, en tal caso, estamos en la misma posición que la del tribunal de primera instancia para formar juicio sobre el problema en controversia. 5 C.J.S. 751, sec. 1660; *United States* v. *Corporation of the President*, 101 F.2d 156; *Webber* v. *Rosenberg*, 64 N.E.2d 98; *Berry* v. *Kyes*, 22 N.E.2d 622. En el caso de *Preston* v. *Peck*, 180 N.E. 671, estaba envuelto el problema de si ciertas firmas eran genui-

nas, y tanto las firmas impugnadas como los patrones admitidos estaban ante el tribunal de apelaciones. Se resolvió que el tribunal de apelaciones puede considerar la cuestión independientemente de las conclusiones del tribunal de primera instancia.

La razón de ser de la regla al efecto de que las conclusiones sobre testimonio oral no deben ser dejadas sin efecto a menos que sean claramente erróneas consiste en la realidad de que el tribunal sentenciador ha estado en la posición superior de observar directamente los gestos, ademanes y reacciones de los testigos. *Ramos* v. *Rosario*, 67 D.P.R. 683. Se trata entonces de un factor evanescente e intangible que el tribunal de apelaciones no puede captar. *Orvis* v. *Higgins*, 180 F.2d 537, *certiorari* denegado en 340 U. S. 810; *Drew & Co.* v. *Reinhard*, 170 F.2d 679. Pero en el caso de prueba documental, prevalece la objetividad, y no son relevantes las características fugaces de los testigos.

Es interesante observar que nuestra Regla 52 es más específica que su prototipo, la 52 de las reglas federales. La 52 federal se limita a disponer que las conclusiones sobre los hechos no se dejarán sin efecto a menos que sean claramente erróneas, pero la nuestra aclara expresamente que se trata de conclusiones *basadas en testimonio oral.* Aun bajo la regla federal, se ha determinado que ella no es aplicable a prueba documental. Moore's *Federal Practice*, Tomo 5, pág. 2615 y pág. 2637 et seq., sec. 52.04, segunda edición y casos allí citados.

Con respecto al segundo elemento de juicio que hemos señalado—testimonio pericial—hubo un conflicto en las opiniones de los peritos de ambas partes, y el tribunal a quo resolvió ese conflicto impartiéndole mayor peso, calidad y credibilidad al perito de la parte demandada, e indicando que el testimonio de los peritos del demandante consistía de generalidades especulativas. Ha habido expresiones en la jurisprudencia al efecto de que son definitivas las conclusiones de un tribunal de primera instancia que envuelvan una re-

solución de un conflicto entre opiniones de peritos, cuando tal prueba pericial sea la única prueba en el caso, o sea la base exclusiva de las conclusiones impugnadas en apelación. 5 C.J.S. 742, sec. 1657, notas 33 y 34; *Chico Wells Drilling Co. v. Givens*, 206 Cal. 468, 274 Pac. 966; *Sarakoff* v. *Six Companies*, 59 P.2d 302. Sin resolver sobre la virtualidad o implantación de esa regla, ella no podría ser aplicable a este caso, ya que las opiniones de los peritos no constituyeron la única prueba en el caso de autos. La decisión de este litigio envuelve no solamente una consideración adecuada de las opiniones de los peritos sino que también un cabal examen de la prueba documental que le sirvió de base a la opinión de los peritos. Debiendo este Tribunal hacer un estudio original e independiente de la prueba documental, no podemos considerar que sea definitivo, en el sentido de que no esté sujeta a revisión en forma alguna por este Tribunal, la conclusión del tribunal sentenciador en cuanto a la preferencia acordada a la opinión del perito de los demandados. No obstante ello, y estableciendo un balance entre las normas que hemos mencionado, solamente debemos dejar sin efecto las conclusiones del tribunal a quo en cuanto a la superior calidad de la opinión del perito de los demandados, si la prueba documental que examinamos independientemente, demuestra que las conclusiones sobre la prueba pericial son claramente erróneas. *Orvis* v. *Higgins*, supra. Tal postulado establecido en la Regla 52, debe ser especialmente aplicable, con mayor justificación, al campo de las opiniones periciales, en que tanto depende en una estrecha familiaridad con principios científicos. *Graver Tank Co.* v. *Linder Air Products Co.*, (1950) 339 U. S. 605, 609, 610. En el caso de autos, de la prueba documental que hemos examinado independientemente, surge que la señora Aboy viuda de Cintrón escribió y firmó el testamento en controversia. No solamente el apelante ha dejado de demostrar que las conclusiones del Tribunal de San Juan en cuanto a la prueba pericial sean claramente erróneas, sino que, aparte de presunción alguna, hemos llegado a nues-

tra propia conclusión al efecto de que el testamento es auténtico y que las opiniones de los peritos de los demandados tienen mayor virtualidad y eficacia que las opiniones de los expertos del demandante.

La escritura, firmas y carácter de letras en el testamento coinciden con la escritura y firmas indubitadas de la testadora, hasta el punto de quedar excluída la posibilidad de falsificación.

Además de la coincidencia real que existe entre la letra y firma auténtica de la testadora con la escritura y firmas que aparecen en el testamento, consideremos las diversas objeciones formuladas por el demandante contra la autenticidad del testamento. Se alega que existen divergencias de forma y estilo en cuanto a distintas letras, mayúsculas y minúsculas, uniones de letras y números escritos en el testamento, en relación con la verdadera escritura de la señora Aboy, viuda de Cintrón, según ella aparece en los documentos presentados en evidencia por el demandante para que sirviesen como base o patrones de comparación. Los peritos del demandante solamente se refirieron a diez documentos o patrones como base de comparación, a saber, dos cartas escritas por doña Encarnación en el 1928, contemporáneas al testamento, pero que no contienen la firma completa de ella; cuatro cartas escritas en los años 1901, 1905, 1906 y 1911, que adolecen del defecto de ser demasiado remotas con relación a la fecha del testamento, y cuatro cartas escritas en los años 1938, 1939 y 1940. De otro lado, los demandados presentaron una cantidad mucho mayor de cartas y documentos, de reconocida autenticidad, escritos y firmados por doña Encarnación. Muchos de esos documentos eran contemporáneos con el testamento, o fueron suscritos en fechas razonablemente próximas a la del testamento, y contienen la firma completa de doña Encarnación. El tribunal sentenciador resolvió, correctamente, que los documentos-patrones presentados por la parte demandada eran más adecuados, y servían mejor como base de comparación, que los documentos presentados por el de-

mandante, no solamente por su cantidad y extensión, sino que también por su mayor contemporaneidad. Los números, firmas, letras y uniones de letras escritas en esos documentos de superior calidad presentados por los demandados coinciden sustancialmente con los números, firmas y letras escritas en el testamento que han sido señalados específicamente como divergentes por el demandante. No existe divergencia real entre el testamento y los documentos que sirven de patrones más satisfactorios, en cuanto a la forma y estilo de la escritura. Además, aun limitando nuestra investigación a los documentos ofrecidos como patrones por el demandante, aunque es cierto que existen algunas diferencias entre algunas letras específicas escritas en el testamento y las mismas letras correspondientes escritas en tales documentos, sin embargo, esas mismas letras específicas se escriben en otras partes del testamento en forma similar o sustancialmente idéntica a la escrita en los propios documentos sometidos por el demandante. Esto es, la alegada divergencia es solamente parcial y aunque se manifiesta en cuanto a algunas partes del testamento, no se exhibe en cuanto a otras partes del testamento. Una explicación razonable de tal diferencia consiste en la realidad de las variaciones naturales en la escritura de una persona, aun en el mismo documento, no siendo sustanciales tales variaciones en el caso de autos. En este caso existe una identidad o similaridad sustancial en cuanto a las letras y firmas precisamente señaladas por el demandante. Ello es cierto también en cuanto a las sombras en las letras.

Los peritos del demandante formularon un grupo de observaciones que, a juicio de ellos, demuestran que el testamento es espurio. Esas observaciones se prestan a una explicación común, y son las siguientes:

(a) Las letras y las palabras son escritas por doña Encarnación con mayor velocidad en sus cartas que en el testamento, escribiéndose las cartas con un "movimiento de dedos", mientras que el testamento está escrito con un "movimiento de mano".

(*b*) Las letras en las cartas están escritas con mayor inclinación que en el testamento.

(*c*) Las letras en el testamento son más compactas que en las cartas, y el estilo de escritura en las cartas es más libre y espontáneo que en el testamento.

(*d*) Las palabras aparecen cortadas de línea a línea en las cartas presentadas por el demandante, mientras que en el testamento todas las palabras en cada línea son completas.

(*e*) La firma de la viuda de Cintrón aparece escrita de izquierda a derecha en el margen de cada página u hoja del testamento, y no de derecha a izquierda, como lo haría, naturalmente, según el apelante, una persona que escriba espontáneamente un documento. De ello infiere el apelante que un falsificador estampó las firmas, para no dañar con el sudor de su mano lo ya escrito en el documento.

Las objeciones anteriores quedan explicadas razonablemente por el hecho de que una persona, al hacer un testamento, tiene la tendencia a redactarlo en forma cuidadosa, formal y clara, y, por lo menos, con mayor cuidado y claridad que en sus cartas informales, que no revisten la importancia y trascendencia de un testamento.

Los peritos del demandante alegaron que en algunos sitios del testamento la tinta aparece "corrida" o desparramada debido a hongos o defectos en el papel, lo cual demuestra, según ellos, que el documento se escribió en un papel que era muy viejo en la fecha en que se escribió, siendo ello demostración de que un falsificador deliberadamente utilizó un papel viejo para dar la impresión de que el documento se había escrito anteriormente. Tal alegación carece de suficiente importancia para demostrar que el testamento era espurio, especialmente en vista del hecho de que doña Encarnación pudo haber escrito el testamento en el 1928, utilizando un papel de fecha anterior.

Expusieron los peritos del demandante que el documento en cuestión es "legalista", ya que contiene cláusulas de tipo legal que estaban fuera del conocimiento de doña Encarna-

ción. Naturalmente, ella pudo haber seguido instrucciones de un abogado para preparar el testamento. Pero alega el apelante que ello es incompatible con el hecho de que el documento exhibe errores "burdos" de ortografía, tales como la palabra "arvacea" escrita en lugar de "albacea". Pero aun si ella siguió instrucciones de un abogado o un patrón suministrado por un abogado, ello es compatible con el descuido ocasional de incurrir en tales errores.

Los peritos del demandante alegaron que en el margen de las páginas del documento básico aparecen unos rotos que, en vista de su tamaño y naturaleza, no pudieron haber sido producidos por insectos o polilla, sino por una aguja o un alfiler, y que ello es indicio de que un falsificador hizo esos rotos con un alfiler o aguja para dar la impresión de que el papel era viejo y que los rotos pudieron haber sido producidos por insectos. Independientemente del hecho de que ese argumento es incompatible con otros argumentos del demandante (distribución de la tinta en un papel viejo), es razonablemente posible que doña Encarnación hubiese ella misma producido los rotos con un alfiler o aguja a los fines de unir las páginas.

Expone el apelante que una carta presentada en evidencia por los demandados como escrita por doña Encarnación aparece con la fecha de 7 de septiembre de 1928 se refiere a hechos ocurridos con posterioridad a esa fecha, especialmente en cuanto a los hijos de la legataria Gloria Hernández, que nacieron con posterioridad al 7 de septiembre de 1928. Es razonable suponer que se trata de un error de doña Encarnación al fechar la carta. De todos modos, tal irregularidad no demuestra que el testamento fuese falsificado.

Una circunstancia que tiende poderosamente a corroborar la autenticidad del testamento consiste en el hecho de que los principales legatarios o beneficiarios del testamento son las señoras María Vázquez de Hernández Usera y Gloria Hernández. La prueba demostró que doña Encarnación había formado un afecto y cariño sólido, continuo y bien arrai-

gado por esas señoras, con preferencia a otras personas. El contenido del testamento corresponde a y es consecuencia de esa realidad.

 Alega el apelante que el Tribunal de San Juan incurrió en error al no permitir al apelante el formular cierto interrogatorio al testigo José Hernández Usera después de éste haber terminado su examen directo como testigo de los demandados. El contrainterrogatorio se refería a la conducta del testigo y codemandado José Hernández Usera con respecto a ciertos traspasos o enajenaciones de bienes hechos por doña Encarnación, siendo el testigo administrador de los bienes de la testadora, cuyos traspasos, alega el apelante, beneficiaron a Hernández Usera y a su esposa. El apelante hace grandes esfuerzos en su alegato por demostrar que la conducta del testigo Hernández Usera con respecto a esos traspasos, que el demandante pretendía investigar a través de la repregunta, era y es relevante a la cuestión básica en controversia, esto es, si el testamento fué o no fué falsificado. Es innecesario el resolver o dictaminar sobre el problema de la relevancia de tal prueba de la conducta de Hernández Usera con respecto al "issue" de la falsificación, ya que el tribunal a quo no permitió tal contrainterrogatorio, no a base de que fuese irrelevante a la causa de acción que se estaba dilucidando, sino por el fundamento de qué el contrainterrogatorio en cuestión iba más allá del interrogatorio directo. El tribunal no le negó al demandante la oportunidad de tratar de presentar esa misma prueba posteriormente, a través de un examen directo de Hernández Usera como testigo del demandante, o a través de otra prueba, para entonces resolver sobre el problema de relevancia. El tribunal a quo se limitó a resolver, correctamente, que el contrainterrogatorio objeto de este señalamiento de error, no estaba relacionado con los hechos mencionados en el interrogatorio directo y que, por lo tanto, no era permisible, en virtud de lo dispuesto en el art. 155 de la Ley de Evidencia. Los demandados presentaron a Hernández Usera como su testigo. En

el examen directo se limitó a declarar que doña Encarnación le había entregado el testamento original al testigo en el otoño del año 1928 y que la esposa del testigo le había entregado la copia a él, posteriormente. En su repregunta el demandante pretendió interrogar al testigo con respecto a unos traspasos de bienes hechos por doña Encarnación en el año 1943, en vida de ella, y con respecto a lo que había hecho el testigo con relación a esos bienes y traspasos. La repregunta era ajena, y carecía de relación alguna, con el campo cubierto por el interrogatorio directo, y era extraña a, y carecía de conexión lógica con, las cuestiones que surgieron del interrogatorio directo. No se cometió el error señalado.

Alega el apelante que el tribunal apelado incurrió en error al condenar al demandante y apelante al pago de la suma de $3,000 por concepto de honorarios de abogado, más las costas, y que, en todo caso, la cantidad de $3,000 es excesiva. Coincidimos con el criterio del tribunal de San Juan al efecto de que el demandante fué temerario al presentar la demanda en este caso y que, por lo tanto, debe ser condenado al pago de honorarios de abogado. La cuantía señalada de $3,000 en concepto de honorarios de abogados no fué excesiva.

*Debe confirmarse la sentencia apelada.*

Los Jueces Asociados Sres. Pérez Pimentel y Belaval no intervinieron.