EMILIO HORMAZABAL, demandante y apelado, *v.* SECRETARIO DE HACIENDA, demandado y apelante.

Número 11278.

*Sometido:* 5 de marzo de 1956.  *Resuelto:* 30 de abril de 1956.

*Hon. Secretario de Justicia José Trías Monge y José A. García Malpica, Procurador Auxiliar,* abogados del apelante; *Félix Ochoteco, Jr.,* abogado del apelado.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

El Tesorero de Puerto Rico, hoy Secretario de Hacienda, notificó a Emilio Hormazabal una deficiencia de $37,080.03 sobre su contribución sobre ingresos para el año 1948. Dicha deficiencia se fundó en que el contribuyente había obtenido de fuentes no identificadas, un ingreso tributable de $60,000 en adición a los ingresos declarados en planilla para dicho año. El Tesorero llegó a esta determinación contributiva después de practicar una investigación de la cual resultaba que en 3 de mayo de 1948 el señor Hormazabal había prestado en efectivo la suma de $60,000 a Miguel Bidot, suma ésta que de acuerdo con el análisis del incremento del capital del contribuyente de 1932 a 1948, no podía estar a disposición del señor Hormazabal.

No estando conforme con esa determinación contributiva, Hormazabal recurrió ante el Tribunal Superior alegando que los indicados $60,000 procedían de ingresos netos obtenidos por él legalmente en años anteriores al 1949 y no de fondos no identificados para el año 1948 ni para ningún otro año anterior a éste.

Luego de celebrarse un juicio en los méritos, el tribunal a quo dictó sentencia anulando la determinación del Secretario de Hacienda. En apelación éste alega que dicho tribunal cometió error (1) al admitir en evidencia el *Exhibit* X del demandante y utilizar dicha evidencia como fundamento para declarar con lugar la demanda, y (2) al declarar con lugar la demanda, toda vez que las conclusiones de hecho y de derecho que sirven de base al fallo no están sostenidas por la evidencia que le fuera ofrecida.

El primer error fué cometido. La teoría del demandante apelado es que de los $60,000 que prestó en efectivo a Bidot en el 1948 y que el Secretario de Hacienda determinó eran ingresos tributables no identificados, $41,358.75 provenían de la redención de bonos del gobierno de los Estados Unidos a través de The National City Bank of New York.

El Exhibit X del demandante que fué admitido en evidencia por la corte a quo, con la oposición del demandado, es una carta fechada 18 de diciembre de 1952 y dirigida por The National City Bank of New York a Emilio Hormazabal. (¹) En la misma el citado banco le confirmó que en 2 de febrero de 1948 le había liquidado la suma de $41,358.75 que representaba el producido de Certificados de Deuda del Tesoro de los Estados Unidos. El tribunal sentenciador dió valor probatorio a esa carta y fundó su sentencia, en parte, en su contenido. (²) Dicha carta tendía a probar (1) que el demandante era tenedor de Certificados de Deuda del Tesoro de los Estados Unidos, (2) que dichos certificados le fueron liquidados por The National City Bank of New York, y (3) que el producto de dicha liquidación ascendió a la suma de $41,358.75. Este último hecho es un factor decisivo en el caso ya que el producido de la liquidación de los Certificados de Deuda representa una, parte sustancial del ingreso del contribuyente considerado por el Secretario de Hacienda como no identificado.

---

(¹) Dicho Exhibit X, lee textualmente:

"New York, 13, N. Y.
"December 18, 1952

"Via Air Mail
"Mr. Emilio Hormazabal
"c/o Francisco Olazabal
"Bayamón, Puerto Rico
"Dr. Mr. Hormazabal:
"We hereby confirm that the following securities were liquidated by you through us:
"On February 2, 1948  $41,358.75 representing proceeds of U. S. Treasury ⅞% Certificates of Indebtedness.
"Very truly yours,
"The National City Bank of New York
"p. p. (Sgd.)  A. G. Natvig
A. G. Natvig."

(²) El tribunal a quo hizo la siguiente conclusión de hecho:
"El día 2 de febrero de 1948 liquidó en el National City Bank of New York, en dicha ciudad, unos bonos del Tesoro de los Estados Unidos que poseía, en virtud de la cual liquidación recibió la suma de $41,358.75, y en el mes de mayo del mismo año, le prestó a Miguel Bidot la suma de $60,000 que éste garantizó con una hipoteca."

La indicada carta era inadmisible en evidencia. Los hechos expuestos en ella no pudieron ser cuestionados por el demandado mediante la repregunta al funcionario del banco firmante de la misma. La prueba era de referencia. Art. 26 Ley de Evidencia; V Wigmore *On Evidence*, secs. 1362, 1363, 1364 y 1367, págs. 3 y siguientes. Sin embargo, el apelado alega que cuando se admitió el referido documento en evidencia, ya había prueba independiente en el caso sobre los hechos contenidos en el mismo. No es del todo correcta esta afirmación. En un interrogatorio escrito, contestado por el demandante y admitido como prueba de las dos partes, se hace constar:

"1—(a) Obtuvo el demandante los $60,000 por concepto de sueldos, beneficios de sociedades, intereses sobre inversiones hipotecarias y *de redención de Bonos de Estados Unidos*." (Bastardillas nuestras.)

Por otro lado, el testigo Francisco Olazabal, presentado por el demandante declaró respecto a estos bonos que él sabía que Hormazabal tenía bonos aunque no sabía cuándo los adquirió y que esos bonos los cambió para hacer la hipoteca de Bidot, todo lo cual le consta porque Hormazabal quería llevar el dinero que él tenía para España y el testigo le dijo que no lo llevara; que entonces Hormazabal decidió traerlo para Puerto Rico y lo invirtió aquí. Esa es toda la prueba, fuera del susodicho Exhibit X, que hay en el récord en relación con los bonos. Dicha prueba a lo sumo establece que el apelado Hormazabal tenía dinero invertido en bonos del Gobierno de los Estados Unidos; que redimió esos bonos y que su producto fué invertido en la hipoteca de Bidot; pero el Exhibit X del demandante probaba un hecho adicional que como dijimos antes era esencial para la resolución del caso. Este hecho es la cantidad de dinero obtenida por Hormazabal en concepto de liquidación de los referidos bonos. El citado Exhibit X es la única evidencia que hay en el récord sobre el monto de dicha suma. No sería correcto decir, por tanto, que la admisión de esa

evidencia nada agregaba a la que ya se había admitido y en su consecuencia que el error cometido no fuera perjudicial. *Cf. Zayas* v. *Autoridad de Tierras*, 73 D.P.R. 897; *Insular Industrial, etc. Ass'n.* v. *Cintrón*, 52 D.P.R. 631; *Pueblo* v. *Compañía Insular de Transporte, Inc.*, 46 D.P.R. 596; *J. S. Waterman & Co.* v. *Méndez Hnos. & Co.*, 44 D.P.R. 351; *Pueblo* v. *Rodríguez*, 41 D.P.R. 382; *Webb* v. *Porto Rican American Tobacco Co.*, 16 D.P.R. 398.

■■ En el segundo señalamiento de error el apelante ataca las conclusiones de hecho y de derecho del tribunal a quo, alegando que las mismas no están sostenidas por la prueba. El nervio de su contención es que el contribuyente no destruyó la presunción de corrección que favorece la determinación contributiva, por lo que bajo la autoridad del caso *Tes.* v. *Tribl. Contribuciones y Aguirre*, 70 D.P.R. 408, la demanda debió ser declarada sin lugar.

El apelante discute este error partiendo de la base, pero sin admitirlo, que el Exhibit X del demandante fuera admisible en evidencia. Hemos dicho que el Tesorero llegó a su determinación contributiva utilizando el método o sistema de analizar el capital del contribuyente (*networth method*) durante un número de años.(3)

De acuerdo con los números aceptados por ambas partes, Hormazabal invirtió en Certificados de Deuda del Tesoro de

---

(3) Véase *Goe* v. *C.I.R.*, 198 F.2d 851, cert. denegado, 344 U. S. 897; *Davena* v. *United States*, 198 F.2d 230; cert. denegado, 344 U. S. 878; *Gariepy* v. *United States*, 189 F.2d 459; *Dawley* v. *United States*, 186 F.2d 978; *Bell* v. *United States*, 185 F.2d 302, cert. denegado, 340 U. S. 930; *Pollock* v. *United States*, 202 F.2d 281, cert. denegado, 345 U. S. 993; *Holland* v. *United States*, 348 U. S. 121; *Friedberg* v. *United States*, 348 U. S. 142; *United States* v. *Calderón*, 348 U. S. 160; *Smith* v. *United States*, 348 U. S. 147; Blackburn, *Arbitrary Methods of Income Determination; Taxes, The Tax Magazine*, noviembre 1952, pág. 905. Véase además en la revista *Taxes*, ob. cit., correspondiente al mes de febrero de 1953, pág. 112, el artículo *Recent Civil Fraud Cases—Problems of Burden of Proof*, subtítulo, *Indirect Proof of Income, Bank Deposit Method;* Mills, *The Net Worth Approach in Determining Income*, 41 Va. L. Rev. 927.

los Estados Unidos en 1941 la suma de 40,000. (⁴) Al redimirlos en 1948 recibió el capital más $1,358.75 de intereses. En 1946 había recibido intereses adicionales sobre dichos valores por la suma de $656.25. En total había recibido para el año 1948, por los conceptos expresados, $42,015. Por liquidación de su participación en la sociedad F. Olazabal y Cía., S. en C., el contribuyente tuvo un ingreso en diciembre de 1943, de $43,137.42. (⁵) En 1945 recibió $8,000 en pago de la venta de un condominio en un solar. Además recibió ingresos durante los años 1945, 46, 47 y 48 por concepto de intereses sobre otras obligaciones, montantes a la suma de $3,600. El contribuyente tuvo por tanto, un ingreso total desde 1943, fecha en que se retiró de los negocios, hasta 1948, de $97,752.42.

En cuanto a sus egresos durante el mismo período, no hay controversia sobre las siguientes partidas: $20,000 de un préstamo hecho por Hormazabal a Francisco Olazabal en 22 de junio de 1945; $60,000 prestados a Miguel Bidot en 3 de

---

(⁴) Dice el apelante en su alegato, escolio 14:

"Aunque el demandante no estableció por medio de su prueba cuándo dichos certificados de deuda del Tesoro Federal fueron adquiridos por el Sr. Hormazabal, ni por qué cantidad de dinero, se puede razonablemente inferir que los mismos se adquirieron por la suma de $40,000 en 11 de abril de 1941. Veamos: si en febrero 2 de 1948 el señor Hormazabal recibió al liquidar sus certificados de deuda del tesoro federal la suma de $41,358.75 y de acuerdo con la contestación del demandante al interrogatorio del demandado dicho demandante recibió en 1948 la suma de $1,358.75 de intereses de los llamados bonos de Estados Unidos, se puede concluir que dichos $1,358.75 corresponden a intereses y los otros $40,000 a devolución de capital. Ahora bien, si por el mismo concepto de intereses sobre dichos supuestos bonos el señor Hormazabal recibió según informa él en su referida contestación al interrogatorio del demandado, para el año 1946 la suma de $656.25, resulta que en total recibió $2,015 por intereses sobre dichos bonos. Como dichos bonos devengaban un interés de ⅞% anual sobre el capital de $40,000, para que los mismos produjeran un total de intereses de $2,015 fué necesario que se poseyera los mismos por un total de 5 años y 297 días, o sea, que se hubieran adquirido alrededor del 11 de abril de 1942. (Para facilitar a este Hon. Tribunal el cotejo de estos cálculos, llamamos su atención hacia el hecho de que $40,000 al ⅞% anual producen al año por concepto de intereses la suma de $350.)"

(⁵) Exhibit 1 del demandante (Escritura núm. 60 de 2 de diciembre de 1943 otorgada ante el notario Gaspar Rivera Cestero).

mayo de 1948 y $5,615.81 pagados por contribución sobre ingresos en el período comprendido entre 1943 y 1948, ambos años inclusive. Esto hace un egreso total de $85,615.85 sin incluir, desde luego, los gastos personales del contribuyente. Mediante una simple operación aritmética, restando el pasivo del activo, quedaría un remanente de $12,136.61 para cubrir los gastos personales del contribuyente.

Pero el Secretario de Hacienda incluyó otras partidas en el pasivo, que de ser correctas producirían como resultado que los $60,000 prestados por el apelado a Bidot, son ingresos no identificados. Una de estas partidas es la suma de $19,419.82 que el contribuyente entregó a Olazabal en 26 de octubre de 1947. Dicha entrega está evidenciada por una carta escrita desde Madrid en 20 de enero de 1951 por don Luis Collado a su apoderado en Puerto Rico, Francisco Olazabal. La carta, en lo pertinente, dice: "Sobre la información que me pides, afortunadamente ahora te la puedo dar exacta porque tengo aquí todos los apuntes. Según mis 'récords' tu cuenta aparece debitada en la siguiente forma y con las partidas que a continuación te detallo . . . . ; y el 28 de octubre de 1947 también te entregó Emilio Hormazabal $19,419.82 que correspondían a otra transferencia que yo le hice aquí y que me liquidó con la mencionada cantidad. La información que te doy de estas remesas puedo asegurarte que es exacta y espero que esté de acuerdo con tus anotaciones . . . . . ." El apelante alega que "consideró dichos $19,419.82 como un gasto o desembolso del Sr. Hormazabal ya que no pudo determinar a través de su investigación por qué concepto Hormazabal debía dicha cantidad de dinero al Sr. Collado". Sin embargo, lo que se desprende de la indicada carta es que Collado hizo en Madrid una transferencia a Hormazabal de $19,419.82, y que éste le liquidó dicha transferencia entregando igual suma a Olazabal en octubre 28 de 1947. No hay base pues para considerar que al efectuar dicho pago el contribuyente hizo una inversión de $19,419.82 que redujo en igual cantidad su activo disponible.

El Secretario de Hacienda también incluyó en el pasivo la suma de $18,000 que consideró, a base de un estimado, eran los gastos personales en que el contribuyente había incurrido durante el período comprendido entre el 31 de octubre de 1943 y el 3 de mayo de 1948, o sea, a razón de $4,000 anuales por un período de 4½ años.

Al hacer el análisis del capital del contribuyente durante el indicado período [1943–1948] señalamos que los ingresos sobrepasaban los egresos por $12,136.61, sin incluir en dicho análisis los gastos personales del contribuyente. Estos gastos los calculó el Secretario de Hacienda en $18,000, o sea, a razón de $4,000 anuales. Dicho cálculo se fundó principalmente en que después del 1943 el contribuyente estuvo viajando constantemente. Pero en vista de otros hechos que surgen de la prueba podemos convenir con el apelado en que la suma de $12,136.61 sería razonable para cubrir dichos gastos personales. Los cálculos hechos por el Secretario de Hacienda no están basados en datos, ni números específicos.([6]) Hormazabal era un hombre soltero que vivía en una casa de familia. No tenía otras obligaciones que las suyas personales; era extremadamente económico y vivía humildemente. Desde 1934 a 1943 había retirado de la Sociedad F. Olazabal & Cía., S. en C., para gastos personales la cantidad total de $17,201.33, o sea, un promedio menor de $2,000 anuales. Al calcular los gastos mientras viajaba no puede olvidarse considerar que Hormazabal no incurría en gastos en Puerto Rico. No sería pues irrazonable calcular dichos gastos personales en $3,000, más o menos, al año. Por ello nos parece que el cálculo de los susodichos gastos hechos por

---

([6]) Lo único que aparece del récord en relación con estos $18,000 es el testimonio del inspector Fernando Fernández, quien declaró:

"P.—¿Cómo obtuvo esa información, qué datos tuvo para llegar a los $18,000?

"R.—Yo fuí al Negociado de Emigración. Él salió en 1944. En el 1946 volvió y hay un dato, que en el 1948 salió y no ha regresado. Es una persona que está viajando continuamente hacia España y hacia Estados Unidos. Yo consideré que $4,000 era una cantidad razonable al año por persona."

el Inspector del Negociado de Contribuciones sobre ingresos es un tanto elevado.

El Secretario de Hacienda también incluyó como un egreso, la suma de $40,000 que el contribuyente invirtió en los Certificados de Deuda del Tesoro de los Estados Unidos. Su razonamiento es que si bien es cierto que Hormazabal tuvo un ingreso en el 1948 de $41,358.75 como producto de la redención de dichos valores, no es menos cierto que él tuvo que hacer una inversión de $40,000 para adquirirlos. La falla del argumento está en que según el análisis de los ingresos del contribuyente desde 1943, éstos montan a $97,752.42. No podemos deducir de esta cifra los $40,000 invertidos en Certificados de Deuda porque conforme sostiene el propio apelante dicha inversión la hizo el contribuyente antes del 1943, o sea, en el 1941.

Por lo expuesto concluímos, que si el Exhibit X del demandante apelado hubiera sido admisible en evidencia, esto es, que de haberse probado que el demandante recibió en 1948 la suma de $41,358.75 como producido de los Certificados de Deuda del Tesoro de los Estados Unidos, él hubiera identificado el ingreso que el apelante consideró como no identificado y que originó la deficiencia aquí envuelta.

Aunque el segundo error no fué cometido el primero conlleva la revocación de la sentencia apelada. Consideramos, sin embargo, que en beneficio de la justicia debe darse al apelado una oportunidad para presentar evidencia competente y admisible sobre el hecho contenido en el Exhibit X.(⁷) *Cf. Cruz* v. *Sucn. González*, 72 D.P.R. 308; *Sánchez* v. *Corte*, 69 D.P.R. 493.

En su consecuencia *la sentencia apelada será revocada y el caso devuelto al tribunal a quo para la celebración de una vista al único fin de que dicho tribunal reciba la prueba que las partes tengan a bien presentar sobre el hecho contenido en el Exhibit X del demandante, luego de lo cual dictará sentencia no inconsistente con los términos de esta opinión.*

(⁷) Es probable que si el tribunal a quo hubiera denegado la admisión de ese documento, el demandante hubiera tratado de probar el mismo hecho con otra evidencia.