Rafael Carrión Pacheco, querellante y apelado, *v.* Tesorero de Puerto Rico, querellado y apelante.

Número 11279.

*Sometido:* 7 de marzo de 1956. *Resuelto:* 8 de junio de 1956.

372

*Hon. Secretario de Justicia José Trías Monge* y *Manuel J. Medina Aymat,* abogados del apelante; *R. Rivera Zayas, G. Rivera Cestero* y *Milton F. Rúa,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR SALDAÑA emitió la opinión del tribunal.

El problema que se suscita en el presente recurso es en síntesis el siguiente: ¿cuál fué el importe o cuantía de los

gastos por concepto de viajes y de agasajos que hubo el contribuyente en los años de 1945, 1947 y 1948? El Secretario de Hacienda administrativamente fijó dicha deducción, bajo la sec. 16 (a) de la ley aplicable (13 L.P.R.A. sec. 695), en las sumas de $15,312.62 en 1945, $16,627.38 en 1947 y $16,318.09 en 1948. Ante el Tribunal Superior el contribuyente reclamó $32,000 para cada uno de dichos años. En el acto del juicio el demandado no practicó prueba de clase alguna: descansó exclusivamente en la presunción de corrección. A base de la prueba testifical que presentó el demandante sobre la naturaleza y la cuantía de los referidos gastos, el tribunal sentenciador declaró con lugar la demanda. No conforme, el Secretario de Hacienda señala en apelación (1) que no se destruyó la presunción de corrección de la determinación administrativa de deficiencia ni se demostró que el método utilizado por él para calcular dichos gastos fuera incorrecto, y (2) que la prueba presentada es insuficiente para sostener las determinaciones de hecho del tribunal a quo en cuanto al importe de los gastos de viajes y de representación. Creemos que dichas contenciones del apelante son infundadas e insostenibles.

En el juicio que se celebró ante el Tribunal Superior las partes estipularon que sólo había controversia en cuanto a la cuantía de los gastos de viajes y de representación. Es decir, el demandado aceptó (1) que dichos gastos se incurrieron en el negocio u ocupación del contribuyente, (2) que los mismos eran ordinarios y necesarios y se pagaron dentro de cada uno de los años contributivos en controversia, y (3) que los gastos de viaje fueron incurridos mientras el contribuyente se hallaba ausente de su residencia en asuntos relacionados con su negocio. Cf. 4 Mertens, *Law of Federal Income Taxation* (ed. revisada), 25.07 y sigte., 25.88 y sigte., 25.91 y sigte.

El demandante presentó como prueba testifical, el testimonio del contador Jaime A. Montoya, el del Sr. Luis A. Valiente, corredor de bolsa y banquero de inversiones, y el

suyo propio.(¹) Declaró Carrión que, en su carácter de vice-presidente ejecutivo del Banco Popular, recibió de dicha institución anualmente las sumas de $12,000 para gastos de representación en Puerto Rico, y de $20,000 para gastos de viajes y de representación en los Estados Unidos; que incurrió en cuantiosos gastos por dichos conceptos en cada año, pero no llevaba cuentas detalladas de los mismos mediante comprobantes, facturas, recibos u otros récords; que en Puerto Rico por lo menos semanalmente llevaba a cabo agasajos, comidas, y otros obsequios para clientes del banco y personas distinguidas e influyentes en los negocios, industrias y finanzas; que a menudo se veía precisado a obsequiar a visitantes distinguidos que venían de los Estados Unidos y con los cuales el banco tenía interés en relacionarse o que ya eran clientes o amigos del banco; que en in-

---

(¹) Montoya se limitó a declarar *sobre el método* que usó el Secretario de Hacienda para fijar los gastos del contribuyente por concepto de viajes y representación en la notificación de deficiencia para 1945, 1947 y 1948. El demandado no practicó prueba testifical o documental al respecto, aceptando en el juicio y ante este Tribunal que la declaración de Montoya es correcta, a saber: (1) en la notificación de deficiencia, para fijar los gastos de viajes y de representación del contribuyente en 1945, 1947 y 1948, el Secretario de Hacienda tomó como base el importe total de gastos similares en 1950 cuando Carrión llevó cuentas detalladas y guardó los comprobantes de sus gastos; (2) en dicho año de 1950, la estadía del demandante en los Estados Unidos fué de 147 días y sus gastos allí (que el Tesorero aceptó) ascendieron a $17,700.28; (3) los gastos del demandante en Puerto Rico, que el Secretario de Hacienda no cuestionó, fueron de $12,000 en 1950; (4) el Secretario de Hacienda rechazó la mitad de ambas partidas como gastos personales de la esposa del contribuyente, es decir, el promedio diario de gastos en los Estados Unidos fué de $124.65 (dividiendo $17,700.28 por 147 días), pero el Secretario de Hacienda sólo consideró que era deducible la mitad, esto es, $62.32; y en Puerto Rico dividió $12,000 por 365 días para obtener un cociente de $32.87, pero sólo consideró deducible la mitad, es decir, $16.34; (5) aplicando dichos promedios de "gastos deducibles" diarios a los años envueltos en el litigio, el demandado fijó las deducciones totales por concepto de viajes y de representación que ya mencionamos anteriormente: $15,312.62 en 1945, $16,627.38 en 1947 y $16,318.09 en 1948. Por otro lado, Valiente sólo declaró que los costos de las comidas en restaurantes de primera categoría en Nueva York "son fantásticos" (veinticinco dólares por persona) y que un ejecutivo de un banco, como lo es el contribuyente, tiene cuantiosos gastos de representación en sus contactos con la gente del gran mundo de los negocios en los Estados Unidos.

numerables ocasiones alojaba a dichos visitantes en su hogar, extendiéndoles toda clase de cortesías; que, por razón de su posición como primer ejecutivo del Banco Popular y de la importancia que dicho banco había asumido en la economía local, mantenía en Puerto Rico al principio un automóvil y después tres que se usaban exclusivamente en gestiones de negocios y actividades sociales indispensables a los mismos; que además de los agasajos semanales a los cuales invitaba grupos de diez personas o más, tenía que invitar a almuerzos y a "cocktails" casi diariamente a los incontables clientes y relacionados del banco; que celebraba también grandes recepciones en su casa (que está diseñada especialmente para ese género de actividades) : por ejemplo, en 1945, una sola fiesta le costó $1,200 y, en 1948, en ocasión de la toma de posesión del gobernador, por razones de negocios, invitó a más de 400 personas a un agasajo en su hogar que le costó $4,600; que en total sus gastos de representación en Puerto Rico (aparte de los gastos personales) en cada uno de los años en controversia excedieron con creces la suma de $12,000.

Tocante a sus gastos de viaje (incluyendo comidas y hospedaje) y gastos de representación en los Estados Unidos, en síntesis declaró Carrión que en 1945 hizo 9 viajes y permaneció fuera de Puerto Rico 195 días; que en 1947 hizo 5 viajes y su estancia en Nueva York fué de 226 días; que en 1948 hizo 4 viajes y su estadía en dicha ciudad se prolongó durante 187 días; que (a base de un costo de $330 por viaje de ida y vuelta, más comidas, propinas, etcétera) gastó en conexión con dichos viajes un total de $3,000 en 1945, de $1,650 en 1947 y de $1,330 en 1948; que (a base de la renta fija mensual del apartamiento con sala, dormitorio y cuarto de baño que alquilaba en el Hotel Biltmore y después en el Hotel Croydon) sólo por concepto de hospedaje gastó $3,720 en 1945 y 1947 y $4,590 en 1948; que durante sus estadías en Nueva York él gastaba $500 cada tres o cuatro días en actividades relacionadas con sus negocios,

girando cheques contra su cuenta en el Continental Bank & Trust Co.; que continuamente se veía obligado a invitar a sus clientes y relacionados, en grupos que fluctuaban de 6 a 25 personas, a los mejores hoteles, restaurantes, teatros y clubs de Nueva York y además, en ocasiones, tenía que ofrecerles agasajos especiales (algunos de los cuales describió específicamente y en que no gastó nunca menos de $6,000 al año) para así establecer conexiones con dirigentes de grandes negocios (banca, finanza e industria) en los Estados Unidos, con miembros del Congreso Nacional y con funcionarios de agencias gubernamentales importantes; que además tenía que hacer constantes obsequios, tales como regalos de obras de arte, flores, etc., a las esposas de éstos; que en casi todos los viajes y estadías en Nueva York su esposa lo acompañó para ayudarle a hacer el sinnúmero de gestiones y contactos sociales que mencionó; que para establecer relaciones íntimas con las personas aludidas fué imprescindible la presencia en Nueva York de su esposa, no sólo en la preparación de los agasajos y atenciones adecuados, sí que también en el cultivo de amistades con las esposas y familias de los demás banqueros, financieros, industriales, etcétera; que en los años en controversia el Banco Popular hizo en los Estados Unidos transacciones que representaban beneficios de mucha consideración, pero que en 1950 cambió el ritmo de los negocios y su presencia en Nueva York no fué tan esencial como antes; que él tenía una oficina permanente establecida en dicha ciudad hasta 1950 en uno de los edificios del Chemical Bank; que estimaba los gastos de viajes y representación incurridos en Nueva York en el año 1950 en alrededor de 50% de los gastos incurridos durante los años en controversia; que sus gastos totales en Nueva York en 1945, 1947 y 1948 nunca bajaron de $45,000 al año, pero que a su juicio los gastos estrictamente relacionados con los asuntos del negocio del banco ascendieron anualmente a por lo menos $20,000.

En su declaración, Carrión mencionó específicamente a las distintas personas y entidades con las cuales tuvo que mantener relaciones continuas y estrechas en los Estados Unidos y explicó en detalle por qué dichas relaciones y sus gestiones personales fueron de un valor incalculable para el Banco Popular durante los años envueltos en este litigio. Manifestó, entre otras cosas, que dicho banco compraba y vendía bonos en los Estados Unidos por un valor de $200,000 anualmente; que vendía hipotecas con la garantía de la Federal Housing Authority; que tenía arreglos con la Continental & Trust Company de Nueva York para hacer o proponer negocios con la cartera del Banco Popular, de modo que éste podía fácilmente convertir su activo en numerario liquidando obligaciones a su favor cuando fuere necesario; que la capacidad prestataria del Banco Popular era limitada y sólo con la cooperación de bancos continentales pudieron llevarse a cabo transacciones por cantidades que ascendían a varios millones de dólares, entre otras un préstamo de $7,000,000 a la Autoridad de Tierras de Puerto Rico; que ésas y otras transacciones del Banco Popular requerían gestiones personales suyas en Nueva York; que el promedio del activo del Banco Popular era de aproximadamente sesenta millones de dólares en 1945 y subió hasta más de setenta millones en 1948; que el volumen de negocios desde 1945 hasta 1948 ascendió a centenares de millones de dólares, manejados en inversiones, préstamos y otras operaciones bancarias.

El mero hecho de que no existan listas circunstanciadas de cuentas, ni comprobantes, facturas, recibos u otros récords, no destruye automáticamente el derecho de reclamar una deducción por concepto de los gastos de viaje y de representación que sean ordinarios y necesarios. Desde luego, ni el Secretario de Hacienda ni el Tribunal Superior pueden admitir deducciones por gastos personales. Y como a menudo resulta difícil distinguir o separar una categoría de gastos de la otra, no llevar cuentas con detalles y comprobantes adecuados siempre coloca al contribuyente en una si-

tuación muy peligrosa. No obstante, si cualquier otra evidencia admisible y digna de crédito demuestra que en realidad hubo tales gastos de viaje y de representación y, aunque no sea en forma exacta y cabal, también indica la cuantía de los mismos, debe concederse una deducción a base de una apreciación de lo que de ordinario y según el buen sentido económico, en vista de todas las circunstancias del caso y del negocio del contribuyente, constituya una cantidad razonable por dichos conceptos. *Cohan* v. *Comm'r.*, 39 F.2d 540 (CA 2, 1930); *Wodehouse* v. *Comm'r.*, 178 F.2d 987 (CA 4, 1949).([2]) Por supuesto al hacer este cálculo aproximado el tribunal sentenciador tiene una discreción amplia que raras veces puede ser alterada en apelación. Cf. *Malgor & Cía.* v. *Tribl. de Contribuciones,.* 64 D.P.R. 574, 578 (1945); *Amoroso* v. *Comm'r.*, 193 F.2d 583, 586 (CA 1, 1952), cert. den. 343 U.S. 926 (1952); *Marx* v. *Comm'r.*, 179 F.2d 938, 942–943 (CA 1, 1950), cert. den. 339 U.S. 964 (1950). Sin rebasar los límites de la justicia, según las circunstancias de cada caso concreto, el tribunal sentenciador ". . . si así lo cree conveniente, puede inclinar la balanza en modo restrictivo y adverso para el contribuyente que por su culpa o negligencia haya creado la incertidumbre o inexactitud . . ." Pero, en cualquier caso, ". . . no es fatal que el resultado sea inevitablemente especulativo: muchas decisiones importantes son así, sin que nadie pueda remediarlo." *Cohan* v. *Comm'r.*, supra, págs. 544 a 545.

 Ahora bien: en este caso el tribunal a quo, con razón a nuestro juicio, determinó que era erróneo el método usado por el Secretario de Hacienda para hacer un cálculo estimado de los gastos de viaje y de representación del contribuyente en 1945, 1947 y 1948. En primer lugar, no

---

([2]) Véanse: Gluck, *How Cohan Works: Allowance of Business Expense Deductions When no Exact Records are Kept*, 6 Rutgers L. Rev. 375 (1952); Kramer, *Estimated Income and Expense in the Tax Law*, 32 Taxes 906 (1954); McDonald, *Travel and Entertainment Expenses*, N. Y. U., 11th Annual Institute on Federal Taxation (1953), págs. 1173 a 1187; 4 Mertens, supra, 25.03, 25.04, 25.90 y 25.100.

hay justificación para atribuir la mitad de los mismos a gastos personales de la esposa de Carrión, pues (1) la explicación dada por éste en cuanto a porqué su esposa le acompañó en todos sus viajes y estadías en Nueva York no es irrazonable y su testimonio incontrovertido al respecto mereció crédito al tribunal sentenciador; y sobre todo (2) en sus determinaciones de hecho, que están respaldadas por la prueba, el juez sentenciador consignó que "los gastos *totales* (del contribuyente) en Nueva York, incluyendo los no deducibles por ser personales y no propiamente del negocio, no bajaron de unos $45,000 por año; y, en Puerto Rico, de unos $30,000 por año"; que "todas las cantidades pagadas por la esposa del recurrente para cubrir gastos de agasajos y obsequios a hombres de negocios y esposas, fueron cargadas a fondos asignados por el banco, y puestos a disposición del recurrente, para tales fines"; y que dichas cantidades "fueron consideradas, por el banco y por el propio demandante, justificadamente, como gastos del negocio de éste, y no como gastos personales de su consorte, en parte alguna". Por tanto, la cuantía de los gastos reclamados por concepto de viajes y de representación ($20,000 en Nueva York y $12,000 en Puerto Rico) no incluía gastos personales de la esposa de Carrión, a pesar de que ésta le acompañó en todos sus viajes y estadías a Nueva York y tomaba parte activa en muchos de los obsequios y agasajos del contribuyente en Puerto Rico.(³) En segundo lugar, el promedio diario de

---

(³) De ordinario no son deducciones los gastos de una esposa que acompaña a su marido en un viaje de negocios, a menos que su presencia resulte absolutamente imprescindible para el propósito bona fide del negocio. Por otro lado, aún si la presencia de la esposa es absolutamente imprescindible para fines del negocio, *todos* sus gastos no son automáticamente deducibles. Hay que determinar si parte de los mismos constituyen gastos personales. El tribunal de instancia debe resolver estas cuestiones teniendo sumo cuidado de no admitir deducciones ilegítimas por gastos personales. Véase 4 Mertens, *The Law of Federal Income Taxation*, (ed. rev.), secs. 25.88, 25.89, 25.90 y 25.99. Cf. 1956 Prentice-Hall, Federal Taxes, Vol. 2, Sec. 11,275; Rev. Rul. 55–57, IRB 1955–5; *Axel S. Stockby*, núm. 53,236 P-H Memo TC; *John Charles Thomas*, núm. 39,112 P-H Memo TC; *Walkup Drayage & Warehouse Co.*, núm. 45,241 P-H Memo. TC.

los gastos de representación en *Puerto Rico* no podía obtenerse usando como divisor los 365 días del año, ya que en todos los años en controversia el contribuyente y su esposa estuvieron ausentes del país durante varios meses. Por último, habiendo prueba específica sobre la cuantía de los gastos de viaje y de representación en los años de 1945, 1947 y 1948, el Tesorero no ha debido tomar como base exclusiva los gastos incurridos en 1950. Así, por ejemplo: la estadía de Carrión fuera de Puerto Rico en dicho año sólo fué de 147 días, mientras que en 1945, 1947 y 1948 fué de 195, 226 y 187 días, respectivamente. Además, como determinó el tribunal sentenciador, a base de las explicaciones razonables que contiene el testimonio incontrovertido de Carrión, los gastos incurridos en 1950 fueron bastante inferiores a los que se incurrieron en los demás años.

Ya quedó señalado antes que el Secretario de Hacienda no practicó prueba de clase alguna en el juicio.(⁴) En cambio, el contribuyente presentó prueba testifical que mereció crédito al juez sentenciador y que, en conjunto, basta

---

(⁴) El demandado no recurrió antes del juicio a ninguno de los métodos sobre descubrimiento de pruebas (interrogatorios, deposiciones, etc.). En el juicio, su abogado expresó que el inspector del Negociado de Contribuciones sobre Ingresos, que intervino en la investigación administrativa del caso, había cesado de trabajar con dicho Negociado y que, como le sería un testigo hostil, no deseaba presentar en evidencia su testimonio. Manifestó además al tribunal sentenciador que "el demandado no tiene prueba documental para informarle al tribunal el procedimiento que a través de uno de sus inspectores usó para determinar los gastos de viaje y de representación que le concedió el Tesorero al contribuyente..." Por otro lado, se admitió que el contribuyente había entregado al inspector copias fotostáticas del movimiento de su cuenta bancaria en el Continental and Trust Company de Nueva York durante los años 1945, 1947 y 1948, pero que dichos documentos se habían extraviado en manos del Tesorero, por lo cual no se presentaron en evidencia. En el curso del interrogatorio directo de Carrión, se estipuló que no había necesidad de probar que los negocios bancarios requieren cuantiosos gastos de dinero para mantener relaciones con el público, con otras instituciones bancarias y con la gente del gran mundo de los negocios. Por último, señalamos anteriormente que el demandado aceptó, al comenzar la vista del caso, que *sólo había controversia en cuanto a la cuantía de los gastos de viajes y de representación.*

para sostener las determinaciones de éste respecto al importe de los gastos de viaje y de representación en los años envueltos en este pleito. Nos encontramos, pues, en presencia de un caso en que, sin lugar a dudas, quedó rebatida por la prueba la presunción de corrección que lleva aparejada la determinación contributiva del Tesorero. Es preciso señalar que dicha presunción de. corrección encierra el peligro de inducir al Secretario de Hacienda a actitudes pasivas: ¿por qué esforzarse para conseguir algo que de todas maneras se ha de producir? Debemos disipar ahora sin reservas este equívoco peligroso.

Según doctrina jurisprudencial reiterada, en virtud de dicha presunción, el Secretario de Hacienda no tiene que presentar prueba alguna para demostrar la corrección de sus determinaciones contributivas, mientras no se ofrezca y reciba evidencia creíble y razonable que sostenga las contenciones del contribuyente.[5] Sin embargo, una vez que exista tal prueba en los autos, la presunción desaparece y toca entonces al Secretario de Hacienda presentar evidencia en apoyo de sus contenciones. Si lo hace, el tribunal sentenciador debe determinar los hechos envueltos en el litigio como en cualquier otro caso civil: a base de la preponderancia de la prueba. El único efecto adicional de la referida presunción en la realidad no se presenta sino como excepcional: al terminar de practicarse la prueba y quedar sometido el caso, si el juez sentenciador determina que la evidencia de ambas partes sobre un punto litigioso está en perfecto equilibrio, entonces debe fallar a favor del Secretario de Hacienda porque sobre el contribuyente recae también la carga de persuadir al juzgador. En otras palabras, el contribuyente sobrelleva en realidad dos *riesgos*: el riesgo

---

[5] *Vilanova* v. *Srio. de Hacienda,* 78 D.P.R. 807 (1955); *Compañía Marítima de E. Moreno & Cía.* v. *Descartes, Tes.,* 78 D.P.R. 589 (1955); *Soto* v. *Sec. de Hacienda,* 78 D.P.R. 177 (1955); *Tesorero* v. *Tribl. Contribuciones y Galiñanes, Inc.,* 70 D.P.R. 925 (1950). Cf. *García* v. *Sec. de Hacienda,* 76 D.P.R. 503 (1954) y *González* v. *Tribl. de Contribuciones,* 73 D.P.R. 26 (1952).

de que no se presente prueba y, además, el riesgo de que no se logre persuadir al juez. Debemos hablar en términos de *"riesgos"* porque, en el curso del juicio, cualquiera de las dos partes puede presentar la evidencia que resulte suficiente para cumplir con ambos aspectos del peso o carga de la prueba. (⁶)

Aquí el apelante arguye que su determinación no fué *"arbitraria o caprichosa, y por lo tanto debió haber sido sostenida por el tribunal recurrido"*. La preponderancia de la prueba no se refiere naturalmente al número de testigos ni a la cantidad de documentos. Denota la fuerza de convicción o de persuasión de la evidencia en el ánimo del juzgador. No podemos aquí postular una objetividad estricta que sería ilusoria: hay que reconocer, por el contrario, los factores subjetivos imponderables envueltos en el proceso que se desarrolla en la mente del juzgador. Quizás la única fórmula aceptable es la siguiente: la parte que tiene el peso o carga de la persuasión debe inducir al juez a creer que la existencia de los hechos que afirma es más probable que la inexistencia de los mismos. Pero la "presunción de

---

(⁶) Por lo general, una presunción sólo afecta el peso o carga de la prueba en cuanto al primero de dichos riesgos. Véase *Model Code of Evidence* (A. L. I.) (1942) págs. 306 a 318. Mas no existe norma *a priori* alguna para fijar cuál es el efecto procesal de una presunción. Así por ejemplo: a menudo la razón de ser de una presunción es imponer el riesgo de no presentar prueba a la parte que tiene conocimiento especial de los hechos pertinentes o que, con facilidad, puede conseguir información sobre los mismos. De ordinario esta razón de conveniencia procesal, sin más, no afecta el otro riesgo de que el juzgador no llegue a un convencimiento al evaluar la prueba practicada en el juicio. Y además, la mera conveniencia procesal cede ante valores sociales más altos. En verdad los factores determinantes, al analizar como es preciso cada presunción por separado, son la experiencia, la equidad y los intereses sociales envueltos. Desde luego, puede ocurrir que el riesgo de no presentar prueba recaiga sobre una parte, mientras que el riesgo de no convencer al juzgador lo sobrelleve la parte contraria. Véase *Pueblo* v. *Alsina*, 79 D.P.R. 46 (1956); Morgan, *Some Problems of Proof Under the Anglo-American System of Litigation* (1956), págs. 74–76; Morgan, *Basic Problems of Evidence* (1954), págs. 17 a 40; Morgan, *Some Observations Concerning Presumptions*, 44 Harv. L. Rev. 906 (1931); Gausewitz, *Presumptions in a One-Rule Word*, 5 Vand. L. Rev. 324 (1952).

corrección" no constituye evidencia y sería absurdo sostener que el juez debe pesarla junto con la demás prueba para llegar a una conclusión sobre los hechos. Véanse *A. & A. Tool and Supply Co.* v. *Comm'r.*, 182 F.2d 300 (CA 6, 1950); Maguire, *Evidence: Common Sense and Common Law* (1947), págs. 175 a 199 y Morgan, *Some Observations Concerning Presumptions*, 44 Harv. L. Rev. 906 (1931). Cf. *Soto* v. *Sec. de Hacienda*, 78 D.P.R. 177 (1955). Lo único que corresponde probar al contribuyente es, *primero*, que la determinación o tasación del Tesorero es errónea; y *segundo*, cuál es la base que puede usarse para computar la contribución correcta. No hace falta probar que "sostener la determinación del Tesorero equivaldría a sancionar una injusticia notoria", o que la contribución determinada o tasada es "confiscatoria y opresiva", o que la actuación del Tesorero es "arbitraria, injusta o caprichosa". Nada hay tampoco que requiera un *quantum* de prueba especial, o una fuerza y cualidad singular en la misma. En otras palabras, dicha prueba no tiene que ser extraordinariamente "persuasiva y fehaciente", ni "clara, robusta y convincente", más allá del grado y medida de persuasión que se exige en todos los demás casos civiles. Morgan, *Some Problems of Proof Under the Anglo-American System of Litigation* (1956), págs. 77–86; 9 Wigmore *on Evidence*, sec. 2498. Cf. *Figueroa* v. *Díaz*, 75 D.P.R. 163, 184, 192 (1953). Por tanto, el único problema para el tribunal de instancia es determinar, por una preponderancia de la prueba creíble y admisible, en forma que no sea claramente errónea, cuál es el importe correcto de la contribución que se adeuda al fisco.(⁷)

De ahí que si en los autos hay prueba digna de crédito

---

(⁷) A veces en el pasado hemos sugerido lo contrario en casos contributivos, pero las normas procesales que acabamos de exponer son las únicas que dicta el buen sentido y la lógica para hacer cumplida justicia tanto al erario como a los contribuyentes. Cf. *Viera* v. *Domenech, Tes.*, 53 D.P.R. 327 (1938), (contribución sobre la propiedad); *Riera* v. *Buscaglia, Tes.*, 58 D.P.R. 762 (1941) (idem); *Mayagüez Sugar Co.* v. *Sancho Bonet, Tes.*, 64 D.P.R. 734 (1945) (idem); *Rossi* v. *Tribunal de Con-*

que razonablemente sostenga las contenciones del contribuyente, a juicio del tribunal sentenciador, el Secretario de Hacienda no puede cruzarse de brazos y descansar en la presunción de corrección. Si lo hace, el fallo necesariamente tiene que ser en su contra. *Soto v. Sec. de Hacienda,* 78 D.P.R. 177 (1955) y *Cía. Marítima de E. Moreno & Co. v. Sec. de Hacienda,* 78 D.P.R. 589, 594–595 (1955). De inmediato se advierte asimismo que es fútil invocar la presunción de corrección en este recurso de apelación como fundamento para la revocación del fallo del Tribunal Superior cuando además aquí ni siquiera hay prueba contradictoria en los autos.(8)

Más aún: debemos recalcar que el tribunal de instancia determinó, como cuestión de hecho, que el importe de los gastos de viajes y de representación del contribuyente,

tribuciones, 66 D.P.R. 425 (1946) (idem) ; *Tesorero v. Tribl. de Contribuciones y Destilería Serrallés,* 70 D.P.R. 225 (1949) (idem) ; *Corporación Azucarera v. Tribl. de Contribuciones,* 69 D.P.R. 204 (1948) (contribución sobre ingreso) ; *Tesorero v. Tribl. de Contribuciones y Sucrs. Abarca,* 69 D.P.R. 878 (1949) (contribución sobre la propiedad) ; *Tesorero v. Tribl. de Contribuciones y Aguirre,* 70 D.P.R. 408 (1949) (contribución sobre ingresos). Compárese, sin embargo, los casos citados en el escolio 3, supra.

(8) Conviene hacer una breve caracterización de otros efectos procesales de la presunción de corrección para definir sus contornos, siempre demasiado imprecisos. Se aplica a las determinaciones contributivas en casos de impuestos sobre ingresos, herencias y donaciones, arbitrios, propiedad mueble e inmueble, etcétera. En cuanto a contribuciones de ingresos abarca las deficiencias y todas las adiciones a las mismas (incluyendo las que impone la ley por motivo de negligencia, ignorancia o menosprecio intencional de las reglas y reglamentos o por dejar de rendir declaración o por no pagar plazos de la contribución estimada) salvo las adiciones o penalidades fundadas en una imputación de fraude con intención de evadir la contribución. Es cierto que en la ley federal (desde 1928) existe una disposición específica que impone el peso de la prueba en casos de fraude al Tesorero y que en Puerto Rico nunca se ha adoptado dicha regla estatutaria. Pero el fraude nunca se presume y la norma legislativa federal del 1928 "sencillamente constituye una declaración de lo que la ley era antes de su aprobación." *Budd v. Commissioner,* 43 F. 2d 509, 512–513 (C.A. 3, 1930) ; *Taplin v. Commissioner,* 41 F.2d 454, 455 (C.A. 6, 1930) ; 5 Paul y Mertens, *The Law of Federal Income Taxation* (1934), secs. 48.09 y 48.11. No podemos aceptar lo que de pasada y sin constituir la razón específica del fallo aparece en *Snell Isle, Inc. v. Commissioner,* 90 F.2d 481, 482 (C.A. 5, 1937). También, si el

en cada uno de los referidos años, fué de por lo menos $32,000. No podemos dejar sin efecto dichas determinaciones, basadas en el testimonio oral que tuvo ante su consideración el tribunal sentenciador, a menos que las mismas sean claramente erróneas.(⁹). O dicho mejor, apenas reflexionamos un poco, nos topamos con esta norma flexible que es preciso aplicar siempre con estricta lealtad: toda vez que la adecuación entre la prueba y las determinaciones de hecho no es ni puede ser nunca exacta o matemática y, según las circunstancias de cada caso, será más o menos ajustada, más o menos rigurosa, lo único que podemos exigir al tribunal sentenciador es que se mantenga dentro de unos ciertos límites más allá de los cuales no podría hablarse propiamente de adecuación, siquiera fuera laxa, sino de discor-

Secretario de Hacienda alega que el término prescriptivo se extendió por renuncia del contribuyente, el peso de la prueba lo tiene el primero. 9 Mertens, *Law of Federal Income Taxation*, sec. 50.70. En cuanto a otras limitaciones de los efectos procesales de la aludida "presunción de corrección", véanse: 9 Mertens, supra, secs. 50.61 a 50.72; Casey, *A Case of Failure of Proof in the Tax Court*, 6 Tax L. Rev. 227 (1951); Copelon, *Practical Problems on Burden of Proof in Civil Trials*, N. Y. U. Tenth Annual Institute on Federal Taxation (1952), págs. 865 a 880; Marcosson, *The Burden of Proof in Tax Cases*, 29 Taxes 221 (1951). Además, sobre los problemas que surgen respecto a la carga de la prueba cuando el Tesorero aplica el método del "valor neto", véanse: *Hormazabal* v. *Srio. de Hacienda*, 79 D.P.R. 221, (1956) y los casos allí citados en el escolio 3; *Thomas* v. *Commr.*, 232 F.2d 520 (C.A. 1, 1956), 24 U.S.L.W. 2491; Lipton, *Recent Civil Fraud Cases—Problems of Burden of Proof*, 31 Taxes 110 (1953); Mills, *The Networth Approach in Determining Income*, 41 Va. L. Rev. 927 (1956); Avakian, *The Net-Worth Method of Establishing Fraud*, N.Y.U., 11th Annual Institute on Federal Taxation (1953) págs. 707–735.

(⁹) De acuerdo con la Regla 52 de las de Enjuiciamiento Civil, "las conclusiones de hecho basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas y se tomará en cuenta la oportunidad de la corte sentenciadora para juzgar la credibilidad de los testigos." 32 L.P.R.A. Ap., R. 52. *Malgor & Cía.* v. *Tribl. de Contribuciones*, 64 D.P.R. 574, 578 (1945); *Sierra, Comisionado* v. *Morales*, 72 D.P.R. 693 (1951); *Santiago* v. *Rodríguez*, 72 D.P.R. 266, 275 (1951); *Palmer* v. *Barreras*, 73 D.P.R. 278 (1952); *Sucn. Marrero* v. *Santiago*, 74 D.P.R. 816, 821 (1953). Respecto a las conclusiones de hecho basadas exclusivamente en prueba documental no rige esta limitación. *Wolff* v. *Hernández*, 76 D.P.R. 650 (1954). Sin embargo, se aplica a las que estén fundadas en testimonio pericial. *Jiménez* v. *Jiménez*, 76 D.P.R. 718, 729 (1954).

dancia o error manifiesto. Cf. *Villaronga, Com.* v. *Tribunal de Distrito,* 74 D.P.R. 331, 344–345 (1953); *Morales* v. *Vélez,* 75 D.P.R. 960 (1954); 5 Moore, *Federal Practice,* segunda ed., secs. 52.03 y 52.04. Según se desprende aún del sumario esquema de la prueba que hemos expuesto anteriormente, aquí las determinaciones de hecho del tribunal a quo no son claramente erróneas.

*La sentencia apelada será confirmada.*

Los Jueces Asociados Sres. Negrón Fernández y Sifre no intervinieron ni en la consideración ni en la decisión de este caso.